*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

      Plaintiff-Appellee,

v

JUAN NICO GARCIA,

      Defendant-Appellant.

UNPUBLISHED
August 15, 2024

No. 363267
Kent Circuit Court
LC No. 20-007307-FC

Before: O'BRIEN, P.J., and CAVANAGH and SHAPIRO*, JJ.

PER CURIAM.

This case arises out of the shooting deaths of Jaionna Braden and Quavon Lee on June 7, 2020. A jury convicted defendant, Juan Nico Garcia, of two counts of first-degree, premeditated murder, MCL 750.316(1)(a); three counts of possessing a firearm during the commission or attempted commission of a felony (felony-firearm), MCL 750.227b; one count of possession of a firearm by a felon (felon-in-possession), MCL 750.224f(1); and one count of assault with intent to murder (AWIM), MCL 750.83. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12(1)(a), to concurrent prison terms of life without the possibility of parole for each murder conviction; 25 to 50 years for AWIM; and 36 months to 25 years for felon-in-possession. The trial court also sentenced defendant to two-year prison terms for each felony-firearm conviction, to be served concurrently, but consecutive to defendant's other sentences. Defendant received no jail credit. Defendant appeals by right, contending that the trial court erred by allowing the prosecution to refer to his status as a parolee, that defense counsel was ineffective by failing to object to such references, that the evidence was insufficient to support a conviction of AWIM, that his right to a speedy trial was violated, that defense counsel rendered ineffective assistance by failing to move for dismissal of the charges on the ground of a speedy-trial violation, and that the prosecutor's misconduct denied him a fair trial. Finding no error, we affirm defendant's convictions.

## I. RELEVANT FACTS

Shortly before midnight on June 7, 2020, Steven Sagers left his home to go running. He was running down Bemis Street toward Eastern Avenue when he heard multiple gunshots that

_____

*Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

sounded nearby. He ducked behind a car for cover, and when he stood up, a man came toward him and fired a gun at him; Sagers saw from the muzzle flash that the gun was pointed directly at him. Sagers turned around, ran to his house, locked the door, armed himself, and then called the police.

Responding officers from the Grand Rapids Police Department discovered a dark Chevy Tahoe with the engine running; inside were the bodies of Braden and Lee. Each victim had suffered two gunshots to the head, either of which would have been fatal, and two additional gunshots to the neck and upper body area. Crime scene technicians collected two shell casings from a .45-caliber automatic handgun from outside of the Tahoe. Seven additional casings, were collected from inside the Tahoe when it was processed at the police station.

Braden was one of several women whom defendant was dating. Although defendant was on parole and was not permitted to possess firearms, Braden had a picture on her cell phone of defendant lying in bed with a gun. She reported to police earlier on the day of the murder that defendant had stolen her phone. Defendant was taken into custody for a parole violation on the afternoon of June 8.

Police issued investigative subpoenas to several witnesses, including defendant's father, Juan Domingo Garcia.[1] The day after Garcia testified, his attorney contacted the prosecutor to work out a proffer agreement. Under the agreement, Garcia told police that defendant admitted to him that he had committed the murders and that he and defendant threw the gun that defendant used into the river at Canal Park. He also told the police the route that he took to pick up defendant after the murders, which enabled police to collect video evidence from cameras in the vicinity. Divers located the gun where Garcia said that it would be, and firearms experts matched the shell casings and the metal jacketed fired bullets to the gun recovered from the river.

Defendant was arrested and charged as indicated. Defense counsel moved in limine to exclude reference to defendant's parole status at trial. The prosecutor opposed the motion on grounds that defendant's status as a parolee was relevant to his motive for the murders and to identify him as the murderer. The trial court agreed with the prosecution and denied defendant's request to preclude reference to his parole status.

At trial, Garcia testified that he, defendant, and a neighbor boy had been playing a video game at approximately 11:00 p.m. on the night of the incident. At some point, defendant took Garcia's black Malibu and left. The next thing Garcia knew, he received a call on his cell phone that identified the caller as "Mom." It was defendant, telling Garcia to come pick him up because he had been in a fight. The next morning, Garcia was smoking a cigarette in the driveway when defendant came outside and Garcia asked defendant whom he had fought. According to Garcia, defendant replied that he did not get into a fight; defendant said: " 'I smoked old boy and old girl.' " Defendant said that he shot Lee once and Braden five times, and that someone else had yelled at him, so "he popped a round off at them."

---

[1] Since defendant and his father share the last name, we will for clarity refer to defendant as "defendant" and his father as "Garcia".

The prosecution admitted into evidence numerous video recordings from home and business security cameras that tracked the black Malibu to the area of the murder and afterward traced Garcia's movements from his home, to the place where he picked up defendant after the murders, and back to his home. Cell phone evidence showing the movements of Garcia's phone and the phone used by defendant corroborated the video evidence. Cell phone and other evidence showed that Garcia was nowhere near the area where the murders occurred at the time they occurred. The jury found defendant guilty as charged, and the trial court sentenced him as indicated. Defendant now appeals.

## II. DUE PROCESS

Defendant asserts on appeal that the trial court denied his right to a fair trial by admitting evidence that he was on parole. We disagree.[2]

That defendant was on parole was evidence that he committed previous crimes. "MRE 404(b) governs the admissibility of other-acts evidence." *People v Denson*, 500 Mich 385, 397; 902 NW2d 306 (2017). MRE 404(b) prohibits evidence of a defendant's prior crimes, wrongs, or acts to prove the defendant's character and propensity for committing such acts. See *id*. Such evidence may be admissible "as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material . . . ." MRE 404(b)(2).[3] Determining whether the trial court properly admitted evidence of defendant's parole status requires considering whether: (1) the evidence was offered for a proper purpose, (2) the evidence was relevant, (3) the probative value of the evidence was not substantially outweighed by its prejudicial effect, and (4) the trial court provided a limiting

---

[2] This Court reviews de novo constitutional issues, as well as whether the trial court properly applied the law governing the admission of evidence. *In re Moroun*, 295 Mich App 312, 331; 814 NW2d 319 (2012); see *People v Roper*, 286 Mich App 77, 91; 777 NW2d 483 (2009). This Court reviews a trial court's decision to admit evidence that implicates character for an abuse of discretion. *People v Waclawski*, 286 Mich App 634, 670; 780 NW2d 321 (2009). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes. *People v Orr*, 275 Mich App 587, 588-589; 739 NW2d 385 (2007). Whether a defendant has been deprived of the effective assistance of counsel presents a mixed question of fact and law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). The trial court's factual findings are reviewed for clear error, while its constitutional determinations are reviewed de novo. *Id*. "Clear error exists when the reviewing court is left with the definite and firm conviction that a mistake has been made." *People v Anderson*, 284 Mich App 11, 13; 772 NW2d 792 (2009) (quotation marks and citation omitted). Because there was no hearing under *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973), our review is limited to mistakes apparent on the record. See *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012).

[3] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). This opinion relies on the version of the rules in effect at the time of the trial.

instruction to the jury. See *People v Vandervliet*, 444 Mich 52, 55; 508 NW2d 114 (1993), amended in nonrelevant part 445 Mich 1205 (1994).

Our review of the record indicates that defendant's status as a parolee was admitted for a proper purpose. The prosecution sought to introduce defendant's parole status as evidence of motive for committing the charged crimes and, relatedly, as evidence of the identity of the perpetrator. The prosecution's theory of the crime was that defendant murdered Braden to prevent her from making good on her threats to get him in trouble with his parole agent and that Lee, tragically, was in the wrong place at the wrong time. Defendant stipulated that he was not legally permitted to possess a firearm, and Braden threatened to send his parole agent a picture of him with a gun. If Braden made good on her threats, then defendant's liberty might be at risk. The testimony of several witnesses indicated that defendant was worried about this possibility. Under these circumstances, defendant's parole status was admitted for the proper purpose of proving motive.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Although the prosecution does not have to prove motive in order to obtain a conviction, motive is always relevant. See *People v Rice*, 235 Mich App 429, 440; 597 NW2d 843 (1999). Motive is "the moving power which impels to action for a definite result." *People v Hoffman*, 225 Mich App 103, 106; 570 NW2d 146 (1997). Defendant's parole status was admissible because it made it more probable that defendant was impelled to murder Braden because her threats, if carried out, could have led to the revocation of defendant's parole and the loss of his liberty.

Evidence that is relevant and offered for a proper purpose may nevertheless be excluded under MRE 403 if its probative value was "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Unfair prejudice may exist when there is a danger that the jury will give marginally probative evidence undue or preemptive weight, or when it would be inequitable to allow use of the evidence. *People v Mills*, 450 Mich 61, 75-76; 537 NW2d 909 (1995), mod on other grounds 450 Mich 1212 (1995).

In the present case, defendant argues that the evidence concerning his parole status was character evidence, regardless of the purpose for which it was admitted, and that the jury convicted him on the basis of assumptions about his character. To the extent that defendant maintains that his parole status was improperly admitted under MRE 404(b)(1), his argument is without merit for reasons already stated. And we find no merit to his implicit argument that the verdict rested on the evidence that he was on parole. The evidence of a premeditated murder was strong as was the evidence pointing to defendant as the killer. "The elements of first-degree murder are (1) the intentional killing of a human (2) with premeditation and deliberation." *People v Bass*, 317 Mich App 241, 265-266; 893 NW2d 140 (2016) (quotation marks and citation omitted). See MCL 750.316(1)(a). Braden and Lee each suffered four gunshots. They suffered two deadly shots to the backs of their heads, with one shot each being fired at close range. The number and placement of the gunshots strongly suggested an intent to kill. See *Bass*, 317 Mich App at 266 (indicating that a reasonable trier of fact could infer that a killing was intentional because the victim was shot in the back of the head). Furthermore, the testimony of Braden's mother suggested that Braden

was at the Bemis Street location waiting for defendant to return her phone. Braden texted her mother on the night of the murder that defendant called and said that he found her phone and indicated that he was going to return it to her. Braden's mother texted Braden at 11:00 p.m. and 11:34 p.m., asking whether she had her phone, but received no reply. That defendant essentially lured Braden to a specific location late at night arguably suggested planning and premeditation. Also suggestive of premeditation is defendant's use of Garcia's car and his grandmother's phone, instead of his own car and phone. See *People v Anderson*, 209 Mich App 527, 537; 531 NW2d 780 (1995) (indicating that premeditation may be established by, among other things, the prior relationship of the parties, the defendant's actions before the killing, and the circumstances of the killing). Viewed in the light most favorable to the prosecution, and with reasonable inferences and credibility choices made in favor of the verdict, the prosecution's evidence was sufficient to allow the jury to conclude beyond a reasonable doubt that defendant committed first-degree murder. See *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018); *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011).

Defendant agrees that the evidence supports the conclusion that someone from the Garcia household was the murderer but suggests that his father rather than himself was the killer. Defense counsel argued during closing that the prosecutor's evidence did not overcome reasonable doubt and he elicited testimony during trial that suggested that violent encounters between Braden and Garcia provided Garcia with a motive to harm Braden. Counsel impugned Garcia's credibility, and his questions to various witnesses hinted that Garcia might have hired someone to murder Braden. However, the prosecution also presented evidence that eliminated Garcia as a suspect. Cell phone records and a police interview with Rosario DeJesus established that DeJesus and Garcia had been texting each other before, during, and after the murders. Video footage and phone records corroborated Garcia's accounts of his movements after receiving defendant's phone call to come pick him up. And Garcia's own cell phone records showed that he was at home when the murders were committed. Video footage and cell phone records also established that defendant's grandmother's phone and Garcia's Malibu were in the vicinity of the murder at the time of the murder, and that defendant used his grandmother's phone to call Garcia's phone around the time of the murders. Forensic analysis matched the shell casings and bullets found at the murder scene to the gun that Garcia helped defendant throw in the river at Canal Park. Given this evidence, we see no basis to conclude that the verdict was tainted by the evidence of motive, which we have already concluded was admitted for a proper purpose.

Lastly, a trial court safeguards a defendant's rights when it instructs the jury on the proper use of other-acts evidence that was admitted at trial. See *Roper*, 286 Mich App at 106. The prosecution in the present case requested, and the trial court provided, a limiting instruction that admonished the jury to consider defendant's parole status only when considering whether defendant had a reason for committing murder or specifically intended to kill Braden. The court further admonished the jurors not to consider defendant's parole status as evidence of defendant's character, or to convict defendant because they thought he was a bad person. The court instructed the jury that if the evidence presented at trial did not convince them beyond a reasonable doubt that defendant committed the charged crimes, it must find defendant not guilty. Jurors are presumed to follow the trial court's instructions, *People v Abraham*, 256 Mich App 265, 279; 662 NW2d 836 (2003), and defendant has given us no reason to believe that the jurors in the present case did not follow the trial court's instructions.

Defendant contends that defense counsel rendered constitutionally deficient performance by failing to object to references to his parole status. However, the record shows that defense counsel sought to prevent reference to defendant's parole status by moving in limine to preclude such reference. The trial court denied defendant's motion and, for reasons already explained, properly allowed the admission of references to defendant's parole status. Under these circumstances, defendant has not established that defense counsel rendered deficient performance. See *People v Ericksen*, 288 Mich App 192, 201; 793 NW2d 120 (2010) ("Failing to advance a meritless argument or raise a futile objection does not constitute ineffective assistance of counsel."). Accordingly, defendant's claim of ineffective assistance must fail. See *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012) (indicating that, to prevail on an ineffective-assistance claim, a defendant must establish both deficient performance and that the deficient performance was outcome-determinative).

## III. SUFFICIENT EVIDENCE

Defendant also asserts that the evidence was insufficient to support the AWIM conviction based upon the shots fired at Sagers. We again disagree.

"The elements of assault with intent to commit murder are (1) an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder." *Ericksen*, 288 Mich App at 195-196 (quotation marks and citation omitted). Defendant argues that there was insufficient evidence to establish that he had an actual intent to kill. " 'Intent to kill' may be inferred from all the facts in evidence, including use of a deadly weapon, taking aim at a victim, injury to the victim, evidence of flight and attempts to hide evidence." *People v Everett*, 318 Mich App 511, 531 n 10; 899 NW2d 94 (2017) (quotation marks and citation omitted). Because it can be difficult to prove an actor's state of mind, "minimal circumstantial evidence is sufficient." *People v McRunels*, 237 Mich App 168, 181; 603 NW2d 95 (1999) (quotation marks, citation, and brackets omitted).

Sagers testified that, after hearing multiple gunshots, he took cover behind a car. When Sagers stood up, defendant came toward him, pointed a firearm directly at him, and fired. Officer Matthew Kubiak testified that the shell casing from this shot was found 120 feet from the Tahoe and approximately 90 feet from where Sagers took cover. Sagers turned around, ran to his house, and called the police. From this evidence, the jury could reasonably have inferred that defendant had an actual intent to kill Sagers when, upon leaving the place where he had just killed two people, he saw someone who might have witnessed his crimes, pointed a deadly weapon directly at him, and fired. See *Everett*, 318 Mich App at 531 n 10; see also *People v Plummer*, 229 Mich App 293, 305; 581 NW2d 753 (1998) (affirming an intent to kill when, after shooting the decedent, the assailant fired at a person attempting to run away); *People v Davis*, 216 Mich App 47, 53; 549 NW2d 1 (1996) (concluding that sufficient evidence supported an actual intent to kill when the assailant pointed a gun at the complainant, warned him not to come closer or he would kill him, then pulled the trigger several times, without firing any bullets).

Defendant contends that the evidence was insufficient to prove intent to kill because the shooter fired once at Sagers from a distance of 90 feet, without making any threats or continuing to fire his gun. From this, defendant reasons that the shooter likely wanted to scare Sagers away from the crime scene. That defendant wanted to scare Sagers away is a reasonable inference from the evidence. However, when reviewing a challenge to the sufficiency of the evidence, this Court

is required to view the evidence in the light most favorable to the prosecution, *Meissner*, 294 Mich App at 452, and to draw all reasonable inferences in support of the jury verdict, *Oros*, 502 Mich at 239. Under this standard of review, and considering that "minimal circumstantial evidence is sufficient" to prove an actor's state of mind, *McRunels*, 237 Mich App at 181, we conclude that the evidence presented was sufficient to allow a jury to infer beyond a reasonable doubt that defendant had an actual intent to kill when he fired directly at Sagers.

## IV. SPEEDY-TRIAL VIOLATION

Defendant next claims a violation of the right to a speedy trial guaranteed by the federal and Michigan's Constitutions. US Const, Am VI; Const 1963, art 1, § 20. He also asserts a claim of ineffective assistance of counsel on the basis of defense counsel's failure to move for dismissal of the charges against him on the basis of this violation. These claims are without merit.

Because defendant did not make a formal demand for a speedy trial on the record, this issue is not preserved, see *People v Cain*, 238 Mich App 95, 111; 605 NW2d 28 (1999), and our review is for plain error affecting defendant's substantial rights, see *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999).[4]

To determine whether an accused's right to a speedy trial has been violated, this Court applies a four-part balancing test. *People v Williams*, 475 Mich 245, 261; 716 NW2d 208 (2006). The four factors are: "(1) the length of delay, (2) the reason for delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant." *Id*. at 261-262. None of the factors is "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be relevant." *Barker v Wingo*, 407 US 514, 533; 92 S Ct 2182; 33 L Ed 2d 101 (1972).

"The time for judging whether the right to a speedy trial has been violated runs from the date of the defendant's arrest." *Williams*, 475 Mich at 261. A delay of 18 months or more is "presumed to be prejudicial and the burden is on the prosecution to prove lack of prejudice to the defendant." *People v Wickham*, 200 Mich App 106, 109-110; 503 NW2d 701 (1993). A "presumptively prejudicial delay triggers an inquiry into the other factors to be considered in the balancing of the competing interests to determine whether a defendant has been deprived of the right to a speedy trial." *Williams*, 475 Mich at 262. "Violation of the constitutional right to a speedy trial requires dismissal of the charge with prejudice." *Waclawski*, 286 Mich App at 664-665, citing MCR 6.004(A).

---

[4] To prevail under plain-error review, defendants must establish that error occurred, that the error was obvious, and that it affected their substantial rights. *Id*. at 763. An error affected substantial rights if it "affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. (quotation marks, citation, and alteration omitted). As already indicated, our review of defendant's claim of ineffective assistance is limited to mistakes apparent on the record. See *Heft*, 299 Mich App at 80.

It is undisputed that the length of the delay between defendant's August 2020 arrest and his June 2022 trial was 22 months and that, therefore, prejudice is presumed, necessitating inquiry into the other three factors of the balancing test. It is also undisputed that defendant did not formally demand a speedy trial in the trial court. Therefore, the only two factors in dispute are the reasons for the delay (Factor 2) and whether the delay prejudiced defendant (Factor 4).

When considering the reasons for delay, "reviewing courts may consider which portions of the delay were attributable to each party . . . and may attribute unexplained delays—or inexcusable delays caused by the court—to the prosecution." *People v Smith*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 362114); slip op at 3 (quotation marks and citation omitted). "Although delays inherent in the court system, e.g., docket congestion, are technically attributable to the prosecution, they are given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *Williams*, 475 Mich at 263 (quotation marks and citation omitted). "[D]elays caused by the COVID-19 pandemic are not attributable to the prosecution when evaluating a speedy-trial claim." *Smith*, ___ Mich App at ___; slip op at 1. " 'The government simply cannot be faulted for a highly contagious and mutating virus.' " *Id*., quoting *United States v Pair*, 84 F4th 577, 589 (CA 4, 2023).

Defendant was arrested for the underlying crimes on August 5, and the order by which he was bound over to the circuit court was signed on September 28, 2020. The record shows that COVID-19 accounted for a delay of approximately $4^1/_2$ months, while "other reasons" (presumably docket congestion) accounted for a combined delay of approximately one month. Defendant does not mention COVID-19 in his brief. Rather, he contends that the delays were "unexplained and/or caused either by docket congestion" and that, therefore, this factor weights in his favor.

Contrary to defendant's position, this Court held in *Smith*, ___ Mich App at ___; slip op at 1, that delays resulting from the public-health response to the COVID-19 pandemic are not attributable to the prosecution. In as much as defendant characterizes delays as "unexplained," this Court has observed that the "delays resulting from emergency public-health measures during an unprecedented global pandemic . . . were neither unexplained nor inexcusable." *Id*. at ___; slip op at 5. "To hold a trial amid the pandemic would have required that jurors, witnesses, counsel, and courthouse personnel act contrary to the advice of public health professionals and put themselves in harm's way." *Id*. (quotation marks and citation omitted).

To the extent that delays caused by post-COVID-19 docket congestion are attributable to the prosecution as delays "inherent in the justice system," these delays are "given a neutral tint and are assigned only minimal weight in determining whether a defendant was denied a speedy trial." *Williams*, 475 Mich at 263 (quotation marks and citation omitted). Because the delay attributable to COVID-19 is not attributable to the prosecution and delays attributable to post-COVID-19 docket congestion are, at most, given a neutral tint and assigned minimal weight, the reasons for delay would not support a speedy-trial claim. See *Smith*, ___ Mich App at ___; slip op at 3-6.

The fourth factor is the prejudice to the defendant from the delays. *Williams*, 475 Mich at 262. A defendant may experience two types of prejudice: "prejudice to his person and prejudice to his defense." *Id*. at 264. Defendant claims to have experienced prejudice to his person because the delay caused him to suffer mental anxiety. However, "anxiety, alone, is insufficient to establish

-8-

a violation of defendant's right to a speedy trial." *People v Gilmore*, 222 Mich App 442, 462; 564 NW2d 158 (1997).

"Prejudice to the defense is the more serious concern, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." *Williams*, 475 Mich at 264 (quotation marks and citation omitted). In the present case, the prosecution asserts that there is no record evidence that "Defendant's ability to adequately prepare his case and defend against the charges was affected by the delay." The record supports the prosecution's assertion. Defendant asserted his innocence and sought to raise a reasonable doubt by suggesting that his father or someone else was the killer. However, video and cell phone evidence—upon which delays had no effect—corroborated testimony about defendant's movements and ruled out his father as a suspect.

On balance, the factors and circumstances do not support a claim of a speedy-trial violation. See *Smith*, ___ Mich App ___; slip op at 8. Nor has defendant shown that defense counsel's failure to move for dismissal on the basis of a speedy-trial violation was not objectively reasonable when considered in light of all the circumstances. See *Strickland v Washington*, 466 US 668, 688; 104 S Ct 2052; 80 L Ed 2d 674 (1984); see also *Ericksen*, 288 Mich App at 201 (indicting that "[f]ailing to advance a meritless argument . . . does not constitute ineffective assistance of counsel"). Further, because defendant has not established a speedy-trial claim, he cannot show that, but for defense counsel's failure to move for dismissal on speedy-trial grounds, the outcome of the proceeding would have been different. Therefore, defendant has failed to establish his claim of ineffective assistance.

## V. PROSECUTORIAL MISCONDUCT

Lastly, defendant claims that he was denied a fair trial by the prosecutor's misconduct in knowingly relying on false testimony provided by prosecution witnesses Garcia, Leticia Gallegos, and Steven Sagers. This claim is also without merit. Because defendant did contemporaneously object and must request a curative instruction, this issue comes to us unpreserved. See *People v Bennett*, 290 Mich App 465, 475; 802 NW2d 627 (2010).[5]

Garcia testified at trial that defendant told him the day after the murders that he "smoked old boy and old girl." Defendant implies that the prosecutor knew that this was false because it contradicted the testimony that Garcia gave under an investigative subpoena. Defendant did not provide this Court with any evidence supporting his assertion, and the excerpt from the transcript of the investigative subpoena testimony provided by plaintiff shows Garcia's testimony was substantially the same. Defendant has not established plain error regarding the testimony.

Defendant's claims of prosecutorial misconduct arising from the testimonies of Gallegos and Sagers are similar. In both cases, defendant points to inconsistencies between their trial testimonies and previous statements that they made to the police during the investigation of the

---

[5] We examine unpreserved claims of prosecutorial misconduct to determine whether the claimed error amounted to plain error that affected the defendant's substantial rights. *People v Gibbs*, 299 Mich App 473, 482; 830 NW2d 821 (2013).

shootings and implies that these inconsistencies are evidence that the prosecutor elicited false testimony at trial. As an initial matter, defendant has not established that the testimony of either Gallegos or Sagers was false. And even if their testimony was false, a prosecutor does not knowingly use false testimony by calling a witness who provides testimony that is inconsistent with prior statements under circumstances in which the prosecutor cannot know with certainty which version is accurate. See *People v Knight*, 122 Mich App 584, 593; 333 NW2d 94 (1983).

Nevertheless, the trial testimonies of Gallegos and Sagers were inconsistent with previous statements that they made to investigators. However, a prosecutor may present a witness's inconsistent testimony without violating due process as long as he or she does not conceal the contradictions and has not kept the conflicting statements from the defense. *People v Parker*, 230 Mich App 677, 690; 584 NW2d 753 (1998). It is clear from the record that the prosecutor did not conceal the inconsistencies in Gallegos's and Sagers's testimony, as defense counsel used the inconsistencies in the witnesses' testimonies to impeach their credibility. It was for the jury to determine whether their testimony was credible. See *People v Hieu Van Hoang*, 328 Mich App 45, 68; 935 NW2d 396 (2019). For the foregoing reasons, defendant has not established that the prosecutor plainly committed prosecutorial misconduct by obtaining a conviction through the knowing use of perjured testimony.

Defendant having failed to establish any error warranting relief, we affirm his convictions.

Affirmed.

/s/ Colleen A. O'Brien
/s/ Mark J. Cavanagh
/s/ Douglas B. Shapiro